Good morning, all. Our first case for argument this morning is Medical Protective Company v. American International Insurance. Mr. Gerstein? May it please the Court, John Gerstein on behalf of the Medical Protective Insurance Company of Fort Wayne, Indiana. This is a case involving a dispute between two insurance companies with respect to an insurance policy, but unusually here, my client, an insurance company, is the insured. They are insured by ASLIC, if I can use the acronym, or AIG, it's an AIG company, we call it AIG. What makes the policy unusual is that in the underwriting process, and you can look in the appendix at page 84, my client disclosed that they are frequently the subject of verbal threats, accusations, threats of litigation, and they expressly, in the underwriting process, declined to agree to a provision that would have excluded claims arising out of circumstances, which could be expected to give rise to a claim. You can find that in the appendix at page 169. You'll see a big black X through a provision that would have had, as in Kuransky, Judge Mannion's case, in that case, it had expressly that language, that type of language, knowledge of circumstances that could give rise to a claim. In this case, because MedPro's point was, in the court world, when we're defending insurance, it's just plaintiff 101 to say, I made a policy demand, you're set up, or personal counsel to say, you must settle, protect my insured. And so the parties agreed to strike from the application, which would have been incorporated in the policy, a provision that would have excluded coverage for circumstances known that could give rise to a claim. Instead, what AIG offered was a policy with a very narrow exclusion. And it's literally called, internally at AIG, the known wrongful acts exclusion. And that's key, because you will see below, Judge Moody handled this case, citing Kuransky, but as if we had the typical policy language, the language that says knowledge of a circumstance. But that had been negotiated out of this policy. And you don't have to take my word for it, because it was the AIG witnesses, and if you'll indulge me, because I don't think our briefs adequately quote from this, the two witnesses that we cite the testimony, we just don't quote it. They were asked, what's the purpose of the exclusion? Exclusion M, the one the court relied on. The purpose of the exclusion is to allow the policy to respond to unknown wrongful acts, and not to known wrongful acts. So if Med, and I can get, that's docket 79, 76 at four, page 290, 314. And do you agree that the wrongful act at issue here is whether or not the rejection of the Stowers claim should have taken place in December of 2003 and March of 2004, or put differently, whether or not a reasonable insurer would have accepted that or settled the claim at that time? I was with you until the second half. For sure, the issue is, was there a known? Because what I'm citing here, these people say I asked for a known wrongful act. But putting aside the known or unknown issue, I'm focused on the wrongful act. And that would be the failure in that one particular time to accept the Stowers demand. But a point that was glossed over, I think, both below and in the briefing by AIG, is that its own witnesses have conceded that more than one claim can arise from a single wrongful act. Why is that significant? Because in this case, the court ultimately held when finally the Bramblets were given the right to bring a suit against my client for money it's insured didn't even owe. The federal court on remand ruled the Bramblets had a separate and distinct claim. The court expressly ruled that. That's significant because what the AIG policy, I told you it's an unusual policy, it doesn't have the wording that you see in most policies. A provision that says a series of interrelated wrongful acts, or acts arising from a common wrongful act, claims arising from a single wrongful act, shall be deemed a single claim first made at the earliest claim. It's policy doesn't have that. It has twice litigated that issue and lost. We cited in our brief, in the reply brief, it's footnote nine, I think the landmark case, and in the text the Hewlett case. In those cases, the court said you can't relate these two claims just because they had a common wrongful act because you don't have that language in your policy. But back to the wrongful act at issue here, putting aside the second part of exclusion M, the known or should have known, the wrongful act at issue here, would you agree that the question is whether or not your client should have settled the claim back in December of 2003 or March of 2004 when they got notice, the Stowers notice? Yes. Okay. And you're trying to separate here the Bramlett litigation where the Supreme Court of Texas held that the Bramletts could pursue a claim separately, but didn't your client know fairly early on that Dr. Phillips could have put his claim or sent his claim to the Bramletts to pursue in his place? And isn't that a separate issue? It would have been a separate issue if that had happened, but it didn't and it couldn't have. But does it, for purposes of the exclusion, did it have to happen, or for purposes of the wrongful act? I'm still on that aspect. Did it have to happen or is it something they just had to know could have happened? They had to reasonably expect a claim. But again, I know you've asked me to ignore the known wrongful act. To me, the known wrongful act is dispositive because that's what we bought, the coverage, and that's what their witnesses said. But if I have to go past that, the question is would we reasonably expect a claim? And where things get odd is in this case, the lawyer or the doctor, who's been an insured for MedPro for 30 years and is still an insured, said he never made a claim. In other words, they wanted MedPro to do things. MedPro stood up, they agreed to protect their insurance. So when the judgment came in, they posted a supersedious bond. They protected him. He never, ever was exposed to any money. He never made a claim, had a claim, or a claim he could have signed. Much more importantly though, the lawyer for the Bramletts has said that the Stowers Doctrine, I can give you the exact quote and cite if you want. The Stowers Doctrine protects the insured. It doesn't protect the Bramletts. So what made this case very odd, and we would say a unicorn case, is that what we found ourselves sued for at the end of the day was money our insured never owe. It's the only case of its kind I know of like that. Four justices on the Supreme Court thought that was crazy. If five had thought that, we wouldn't even be here at all. And even on remand, when the district court was asked to enforce the order, in his opinion, he goes, I'm having trouble understanding what they're saying. And he kind of wryly refers to the four dissenting opinions as saying this doesn't make any sense. But he says, I've got to do it. It says the Bramletts have a separate and distinct claim. So MedPro, you can't say in defense of it, I protected my insured. They have their own claim. But it vested at that point. Mr. Klein testified it vested at that point. And he told the court that. So we say we are presenting a claim seeking coverage for a claim by the Bramletts against MedPro. Yes, it arose out of the same alleged wrongful act, failure to settle. But it's claiming a distinct claim, damages in excess of the liability cap for which our insurer never owed any money. But it's still tied to a wrongful act. Absolutely. And doesn't it put you on notice or put your client on notice that your client was told by Dr. Phillips' lawyer fairly early on that he could assign and was considering assigning his claim to the Bramletts, which would be separate than your knowing after the Texas case that the Bramletts had their own separate claims. You're right. And if this policy had the language in it that Kuransky does, the Kuransky policy did, and if they hadn't struck that very language from the application and policy in this court, he would be right. But because MedPro said, look, we get these all the time. I understand you're looking at it through the prism of what happened. But they get thousands of these. Everyone, it's litigation 101 to say, I gave you a demand. You didn't do it. It's bad faith. You must pay. And they disclosed that in the underwriting. And they said, we can't agree to an exclusion based on that because that's our whole life. And so they got this narrow, known wrongful acts exclusion, which AIG's witnesses say they have to know they committed a wrongful act. And to be clear, when they finally got sued at the end of the day, they actually moved for summary judgment that a matter of law they couldn't have committed a wrongful act. Now, the trial court did not grant that. But in denying it, he said, I get that you've got a lot of evidence. You may well prevail at trial. You're entitled to a jury trial. Respectfully, the court below treated it as if we knew we'd committed a wrongful act, when to this day we don't think we've committed a wrongful act. I'd say we, but you don't. Going to the second prong of exclusion M, the question of whether or not your client could have reasonably foreseen that the wrongful act could lead to a claim or suit. How do you get around Kuransky? Okay, you mean assuming, so you're not going to give me the known wrongful act? I'm moving on. Okay. Beyond the known wrongful act. Sorry about that. Even if there's an issue of fact there, you still have to get to the second prong. How do you get around Kuransky? Well, no, but if I win the first prong, I don't get to the second prong. We agree with that. Well, ultimately you have to, and the district court did. So let's move to the second prong. How do you get around Kuransky on the second prong? Okay, with respect to the insured, there was never a time that we did not protect the insured. The insured has said they never made a claim. We voluntarily posted a supersedious bond to protect the insured from whatever the insured did. That was our call. We did that. The insured never could have made a claim because we protected them. As to the Bramlett's, up until the new Texas Supreme Court case, the then pending law in Texas, the Welch case in 2005, this appellate decision, it said carriers can't be liable for amounts above the cap. So we protected the insured. The amounts, we didn't know. The Texas Supreme Court, 5-4, said no, you can't. And that's how we ended up getting sued. So I would say that... But aren't those facts fairly similar to what happened in Kuransky? In the occurrence, the more broad language in Kuransky goes to the first element, whether or not there was a wrongful act. I'm focused on the second element, now the new or should have known, which that occurrence language is not the triggering language. Yes and no. The answer is, in Kuransky, the lawyer admitted negligence. The lawyer admitted the wrongful act. Remember they said, oh my gosh, I think they wrote a letter saying, we had misfiled the contract, we should have sent it, I'm sorry, here it is. But the lawyer fell on the sword and said it was his fault. So that's completely different. It's the opposite of this case. Again, that's the first element. Not the new or should have known. Well, we had an opinion of counsel that we had done nothing wrong. And that nobody had a claim. And certainly nobody had a claim of right at that point. There was not a judgment, there was not an outcome. And again, if you're going to protect your insured until the law changed, there could be no other claim. But I will say, Your Honor, I don't want to waste your time with my points, but you're hitting me on this point, and I can't tell. If you are saying that a reading of that exclusion is that we have to prove two elements, my answer is no. They have to prove two elements. And if they fail to prove one of them, we win without regard to the second element. I was not suggesting you had to prove it. Okay, thank you. Sorry about that. Do you want to save some time for rebuttal? Please, I'm done. Thank you, Your Honor. Thank you, Mr. Gershkin. Ms. Hartman. Thank you. May it please the Court. Good morning, Your Honors. Kim Hartman on behalf of the Appley American International Specialty Lines Insurance Company, which I will refer to as ASIC. The issues on this appeal are controlled by the clear and unambiguous terms of the insurance contract. Not what may have been deleted from an application, but the plain and clear black and white terms of the insurance policy. I will get to exclusion M, but I want to start with the policy, the 2006 ASLIC policies insuring agreement, which sets forth the parameters of when coverage may be offered or available under the policy in the first place. Whether coverage is available under the insuring agreement is the insured's responsibility to establish. Here, the insuring agreement states that coverage under the policy is limited to claims first made against the insured during the policy period. Are you reading from paragraph one, professional liability in this contract? Correct, Your Honor. The insuring agreement, paragraph one, the appendix, page 133. Here, the undisputed and material facts establish that a claim, which under Indiana law means a demand for money, property, or specific relief or remedy, was made years before the 2006 policy incepted on July 1st, 2006. The undisputed evidence overwhelmingly establishes this point. In December of 2004, Neville Manning, the Gramlitz attorney, advised MedPro that it had wrongfully rejected Stowers' demands, warned MedPro that was liable for extra contractual damages, and demanded that MedPro pay more than policy limits to settle the claim with the Gramlitz. But, Ms. Hartman, the insurance contract that we're talking about, the introductory language provides that this is a claims-made form except to such extent as may otherwise be provided herein. And then there's provision one that you were relying on. But why wouldn't endorsement 16 be a provision provided otherwise herein, which is the exact provision of the policy that MedPro is seeking to recover under, and that has an exception for events that occurred prior to the policy period? Endorsement number 16 doesn't apply to alter coverage, that mandates coverage under the 2006 policy only for claims made during the policy period. Endorsement 16 provides that if during the policy period, the CFO, general counsel, or CEO of the insured shall become aware of any occurrence which may reasonably be expected to give rise to a claim against the insured for a wrongful act which first occurs during or prior to the policy period and goes on. When you go back and you read that language, there has to be evidence that during the policy period, the CFO, general counsel, or CEO became aware of an occurrence. There's no indication and there's no evidence in this case that during the policy period of July 1, 2006 to July 1, 2007, that a CFO or a CEO became aware of an occurrence. The district court did not address this particular issue. Correct, Your Honor. Was that an issue in the court below, whether or not the CFO, general counsel, or CEO became aware of it? There was no argument that either a CFO or CEO became aware. There was also no evidence that general counsel during the policy period became aware of any occurrence. There's evidence that David Sherman... I'm sorry to interrupt. Sure. Because my question was a little bit different. Okay. The district court did not address that particular issue, whether or not endorsement 16... Correct. ...would take you outside of the general language that you read in paragraph 1. Correct, Your Honor. Was there evidence? Was this argument made to the district court, namely that endorsement 16 should not apply because there's no evidence that the CFO, general counsel, or CEO became aware of it? There was argument that the endorsement number 16 didn't apply because it didn't strike or remove the ensuring agreements language or exclusion M, that it was a forward-looking clause. Right. And that's a separate argument. Correct. So you're now making what sounds to me like a different argument than was made before the district court, talking about evidence in the record that we don't have before. Right. And there was, I believe, that there was an argument below that there was no evidence and there was no general applicability of endorsement number 16. But in response to the reply arguments raised by MedPro, we went back and we looked, and there is no evidence in the record that the CFO, general counsel, or CEO became aware of any occurrence during the policy period. But if that wasn't raised below, I don't know that there would have been an opportunity to put it in the record. It would have been the argument raised by opposing counsel. It would have been their duty or their obligation to establish evidence in support of their argument that endorsement number 16 applied, and they didn't do so below. And that may be so, but I'm not sure we can address it if it's not something that was addressed and discussed below. I would agree, Your Honor. How do you set a premium? Premiums are determined. The insurance carriers will look at loss history. They'll look at the locality where the business practice and determine how a premium may be set. And I think that that's an important point because here the insured knew prior to inception of the policy that there was a very serious claim for extra contractual damages made against it, a claim so serious that prior to inception of the policy, they offered to settle that claim for $1.6 million, which was eight times policy limits. There was no reasonable or rational explanation why they would have settled or offered $1.6 million if Med-Pro didn't understand at that time that a claim, a valid claim, that it was liable had been made against it. Well, what kind of effort or interrogating goes into setting a premium when you try to find out what you're really insuring? I mean, is there some risk out there that you don't know about or something? How is that even explored before you take somebody's money to insure them? Your Honor, I'm not privy to that process. It's not in the record. But certainly, you know, in including the limitation to coverage in the insuring agreement and the exclusion under Exclusion M, the expectation is that any claims or any foreseeable claims prior to inception of the policy would be reported to the insurer, and ASLIC would have known before setting premiums that, you know, that risk and exposure was out there. And that leads me, Your Honor... I believe it was $5 million, and there was a $1 million retained limit, I believe, Your Honor. Well, I just look at it. When you're setting up insurance, insuring something, you explore who's what you're insuring and how much. I don't know whether somebody goes and interrogates and says, is there anything else going on or something, or they just say, well, nobody said anything, so we're going to go ahead and insure them. I certainly... I mean, there is certainly a process that it involves in setting premiums, and there was the application, but ultimately, to define the parameters of the policy, you have to look to the language of the policy itself. And I do want to address the point regarding the deletion of Question 29 from the application. That deletion from the application has no effect, has no bearing, and does not change the terms of Exclusion M. There's no evidence that there was any negotiation that Exclusion M be modified. There's no indication that MedPro didn't understand what Exclusion M, the purpose of Exclusion M, and that its responsibility, and that it didn't understand that claims that had already been made against it were known wrongful acts or alleged wrongful acts, which foreseeably could result in a claim or suit, would be excluded under the policy. When you look at Exclusion M, again, I think you need to look at the language which states that the policy does not apply to any claim arising out of any wrongful act occurring prior to inception of the first policy, which was on June 30th of 2005, if on such inception date the insured knew or could have reasonably foreseen, if any insured knew or reasonably could have foreseen that such wrongful act could lead to a claim or suit. Now, wrongful act in this policy is defined as any breach of duty, neglect, error, omission, or other act done. Here, there is evidence that prior to inception of the first policy, MedPro knew that it had committed errors, knew that it had committed omissions. Do you agree that the wrongful act that's at issue here is whether or not a reasonable insurer would have paid the Stowers claim back in December of 2003 and March of 2004? Yes, Your Honor. Whether it wrongfully rejected the two Stowers demands. In 2005, in February of 2005, prior to inception of the first policy, end of June of 2005, John Beddingfield, a claim specialist for MedPro, wrote to Paul Rinaldi and David Pinkerman, two other MedPro employees, wherein he admitted that MedPro committed numerous errors in responding to the Stowers demands. He stated that MedPro's reasons for not paying policy limits when the first Stowers demand was made was inadequate. He noted that MedPro's responses to both demands were late, and he concluded that MedPro has a problem for failing to respond during a time limit and then doing so in such a poor manner, thereby admitting that there had been wrongful acts committed. What about the fact that MedPro sought outside counsel and got advice of counsel that they wouldn't have liability here? I think that that is important for multiple reasons. One, it demonstrates that they knew that a claim had been made against it. Does it demonstrate they knew they had a claim or that they were analyzing whether or not there could be a claim? I'm not sure it demonstrates they knew. Either way, it actually doesn't matter because at the very least, it demonstrated that there could have been a claim for that wrongful act brought against it. And when Feebold was retained by MedPro, that was prior to inception of the first policy. And so that is, again, evidence that they knew and appreciated that this wrongful act could reasonably lead to a claim or suit. But doesn't the opinion of the law firm cut the other way? Because they said they didn't anticipate they'd have any liability. Why wouldn't that cut the other way or at least raise an issue of fact? Because the question isn't whether the... The question isn't whether MedPro at that time knew or believed that the claim would be meritorious. It's whether or not they could foresee a claim would be made. But on the wrongful act question, isn't the question whether or not a reasonable insurer would have paid the amount back at the time? And how can you say there isn't at least an issue of fact as to whether or not a reasonable insurer would have paid it when that insurer's outside counsel is saying you're not going to have liability on it? I mean, the key question, Your Honor, is not whether they knew that there would ultimately be extra-contractual liability, but whether... I agree. But there still has to be a wrongful act and the definition in the policy itself, as you raised at the beginning, wrongful act is defined on what a reasonable insurer would have done at the time. A wrongful act is defined as an error, and then when you look at foreseeability, you objectively look as to whether a reasonable insurer... When you look at foreseeability, the wrongful act is tied to the Stowers claim. Correct. And the Stowers claim is whether or not a reasonable insurer would have paid the amount at the time. So the wrongful act, taking it two steps removed, is tied to what a reasonable insurer would have done. Yes, Your Honor. Following you, however, the key is not whether they would have anticipated... A reasonable insurer would have anticipated a claim. It's whether or not it was foreseeable. I think we're running... That's the second part of exclusion there. Right. And I see that my time is just about to expire, and I do also want to highlight that MedPro knew that its wrongful act could reasonably lead to a claim or suit because in April of 2005, Bob Ignacia, MedPro's VP of Claims, admitted that. When asked during deposition why he referred the matter to MedPro's in-house litigation attorney, Dave Sherman, he testified, to the extent that there was a potential claim that could be brought against the company, threats of potential claims, we would frequently transfer responsibility to evaluate those matters to the legal department, thereby admitting that there was a wrongful act which MedPro knew could result in a claim or suit. I see that my time has expired. Just one second before we go, and that's with the settlement of the hospital. That was what, 2.3? 2.3 million. And that would seem to be entering into part of this, saying, well, the hospital's 2.3 million, and then they go around and say, well, we've never had something over 3 million. I don't know. And just getting to ASLIC, what did they know at the time of this premium? I think that's, I think the 2.3 million settlement is an important point, and I would refer your honors to our brief where we show that prior to inception of the first ASLIC policy, the value of this, the value of the Brownletts' claim was estimated to be over $3 million by MedPro's insurance adjuster. I believe it was Paul Ronati. In addition to this 2.3 that the hospital had to pay? It would have been, it was estimated at 3 million plus medical costs, which was over $100,000. So it would have been approximately, a value of approximately 3.1 million. If you take out the 2.3 million settlement, you still have about $600,000 in potential liability, and the policy was only for $200,000. So at that point, they knew that there was exposure to an excess judgment and actual contractual damages. Thank you. Thank you. Thank you. One, two, three minutes? What's your inquiry? Could I have two or three minutes? Yeah, I'm about to give you an extended time in light of the time given to the other side. So I'll increase that to three minutes. Thank you, Your Honor. Let me just start. Counsel said, well, MedPro knew that, she quotes Mr. Benningfield. The irony is, the very document they cite, he begins, he was a fill-in. He just showed up at a mediation because the real claims handler couldn't go. He begins the letter they were relying on by going, I haven't even been through the whole file yet. He said, I haven't been through the whole file yet. And he said, this is just off the top of my head. He doesn't use the top of my head, but that's what he's saying. And then he says, I think we should get a legal opinion of counsel. They went and got a legal opinion of counsel, and counsel said, you don't have any liability. It's that simple. She said, well, they offered to settle for $160,000. That was after the policy. That was after a large verdict. It was, at that point, $13 million. And what our client did was it said to the insured, we're going to post a bond. We're going to protect you up to the cap. We'll fight whatever. We fought the case. Again, had there been a 5-4 the other way, it would have been over. Mr. Christin, I have a question about endorsement 16. The issue was raised by Ms. Hartman that there was no evidence that your CEO, CFO, or general counsel was aware of the wrongful act. Was that issue briefed below, and was there any evidence of that? We briefed that we relied on that exclusion. They did not raise a factual issue, as your honors pointed out. They did not raise a factual issue on that point. And I would say, since we gave notice pursuant to the provision or entitled to the inference, that it's pursuant to the provision.  And counsel also, if you look at the transcript, she agrees that a wrongful act is an error. She said that. So if it's a known wrongful acts exclusion, there has to be a known error. And again, to this day, my client doesn't believe he committed an error. And there was going to be a trial in the underlying case of whether there was an error. Unless you have questions. Thank you. Thank you. Ms. Hartman, thank you. The case is taken under advisement. The court will proceed.